No. 20-1230

# United States Court of Appeals for the Tenth Circuit

———

GREGORY TUCKER,
                               *Plaintiff-Appellee,*

v.

FAITH BIBLE CHAPEL INTERNATIONAL,
                               *Defendant-Appellant.*

———

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, NO. 16-CV-01652, HON. R. BROOKE JACKSON, PRESIDING*

———

**BRIEF OF AMICI CURIAE STATES OF OKLAHOMA, ALABAMA, ARIZONA, ARKANSAS, GEORGIA, INDIANA, KENTUCKY, LOUISIANA, MISSISSIPPI, MONTANA, NEBRASKA, SOUTH CAROLINA, TEXAS, UTAH, VIRGINIA AND WEST VIRGINIA IN SUPPORT OF DEFENDANT-APPELLANT'S PETITION FOR REHEARING EN BANC**

———

JOHN M. O'CONNOR
*Oklahoma Attorney General*

ZACH WEST
  *Acting Solicitor General*
  *Counsel of Record*
OFFICE OF THE OKLAHOMA
ATTORNEY GENERAL
303 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Zach.West@oag.ok.gov

*Counsel for Amici States*

[ADDITIONAL COUNSEL LISTED BELOW]

**Steve Marshall**
*Alabama Attorney General*

**Mark Brnovich**
*Arizona Attorney General*

**Leslie Rutledge**
*Arkansas Attorney General*

**Christopher M. Carr**
*Georgia Attorney General*

**Todd Rokita**
*Indiana Attorney General*

**Daniel Cameron**
*Kentucky Attorney General*

**Jeff Landry**
*Louisiana Attorney General*

**Lynn Fitch**
*Mississippi Attorney General*

**Austin Knudsen**
*Montana Attorney General*

**Doug Peterson**
*Nebraska Attorney General*

**Alan Wilson**
*South Carolina Attorney General*

**Ken Paxton**
*Texas Attorney General*

**Sean D. Reyes**
*Utah Attorney General*

**Jason S. Miyares**
*Virginia Attorney General*

**Patrick Morrisey**
*West Virginia Attorney General*

# TABLE OF CONTENTS

                                                                      **Page**

Table of Authorities ................................................................................. ii

Introduction and Interests of Amici Curiae ............................................. 1

Argument .................................................................................................. 3

      I.      The panel's novel reformulation of the ministerial exception as a question of fact for the jury would lead to excessive entanglement. ................................................................................ 3

      II.     The panel departed from all other courts by failing to recognize that the Religion Clauses provide structural protection against interference in religious leadership disputes. ....................................... 7

Conclusion ............................................................................................... 11

# TABLE OF AUTHORITIES

                                                                   **Page(s)**

**CASES**

*Bryce v. Episcopal Church in the Diocese of Colorado*,
   289 F.3d 648 (10th Cir. 2002) ................................................................. 7, 13

*Cannata v. Catholic Diocese of Austin*,
   700 F.3d 169 (5th Cir. 2012) ............................................................................9

*Colorado Christian Univ. v. Weaver*,
   534 F.3d 1245 (10th Cir. 2008) .......................................................................4

*Conlon v. InterVarsity Christian Fellowship*,
   777 F.3d 829 (6th Cir. 2015) ............................................................... 7, 9, 14

*Davis v. Balt. Hebrew Congregation*,
   985 F. Supp. 2d 701 (D. Md. 2013) ..............................................................10

*Demkovich v. St. Andrew the Apostle Parish*,
   3 F.4th 968 (7th Cir. 2021) ................................................................ 9, 14, 16, 17

*E.g., Sterlinski v. Catholic Bishop of Chi.*,
   934 F.3d 568 (7th Cir. 2019) ............................................................................8

*EEOC v. Harris Funeral Homes*,
   884 F.3d 560 (6th Cir. 2018) ............................................................................8

*EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*,
   2008 WL 5111861 (E.D. Mich. Dec. 3, 2008) ..............................................6

*Fratello v. Archdiocese of N.Y.*,
   863 F.3d 190 (2d Cir. 2017) ............................................................................8

*Gregorio v. Hoover*,
   238 F. Supp. 3d 37 (D.D.C. 2017) ..................................................................9

*Herx v. Diocese of Ft. Wayne-S. Bend Inc.*,
   48 F. Supp. 3d 1168 (N.D. Ind. 2014) ............................................................9

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ................................................ 1, 5, 6, 10, 11, 12, 13, 15, 16

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
    885 F.3d 659 (10th Cir. 2018) .................................................................... 17

*McCarthy v. Fuller*,
    714 F.3d 971 (7th Cir. 2013) ....................................................................... 11

*McRaney v. N. Am. Mission Bd.*,
    304 F. Supp. 3d 514 (N.D. Miss. 2018) ....................................................... 9

*Minker v. Baltimore Annual Conf. of United Methodist Church*,
    894 F.2d 1354 (D.C. Cir. 1990) ................................................................. 14

*Morrissey-Berru v. Our Lady of Guadalupe Sch.*,
    2017 WL 6527336 (C.D. Cal. Sept. 27, 2017) ............................................. 6

*NLRB v. Catholic Bishop*,
    440 U.S. 490 (1979) .................................................................................. 13

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ......................................................................... 4, 5, 6

*Penn v. N.Y. Methodist Hosp.*,
    884 F.3d 416 (2d Cir. 2018) ......................................................................... 8

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3d Cir. 2006) ....................................................................... 15

*Puri v. Khalsa*,
    321 F. Supp. 3d 1233 (D. Or. 2018) ............................................................ 8

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) .................................................................... 15

*Simon v. Saint Dominic Acad.*,
    2021 WL 6137512 (D.N.J. Dec. 29, 2021) .................................................. 9

*Skrzypczak v. Roman Catholic Diocese Of Tulsa*,
    611 F.3d 1238 (10th Cir. 2010) .................................................... 5, 7, 14, 15

*Starkman v. Evans*,
    198 F.3d 173 (5th Cir. 1999) .................................................................................7

*Yin v. Columbia Int'l Univ.*,
    335 F. Supp. 3d 803 (D.S.C. 2018) .......................................................................8

**OTHER AUTHORITIES**

Peter J. Smith & Robert W. Tuttle, *Civil Procedure and the Ministerial Exception*,
    86 Fordham L. Rev. 1847, 1881 (2018) ..............................................................16

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

A core aspect of religious freedom protected by the First Amendment is a prohibition on governmental intrusion into a religious organization's selection (or rejection) of ministerial leadership. The government must tread extremely lightly in this area, as religious adherents have the right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (citation omitted). Critical here, the U.S. Supreme Court has emphasized that the First Amendment's "ministerial exception bars … a suit" by a minister "challenging her church's decision to fire her." *Id.* at 196.

Amici States are home to thousands (if not tens of thousands) of religious organizations, as well as millions of religious believers. The States have an undeniably compelling interest in protecting the constitutional rights of these citizens and the groups that they comprise to select their religious leaders as they see fit. The States also have a powerful interest in protecting their own court systems and governmental departments from entanglement in the internal affairs of religious groups. The panel's opinion threatens both interests.

As Judge Bacharach's dissent details, the panel's opinion breaks with other courts in several ways and will cause severe and sustained entanglement between religious institutions and government, as well as infringement on the religious liberty

rights of countless individuals and organizations. In this circuit, juries will now be tasked with analyzing significant religious questions, courts will be forced to mediate discovery disputes probing religious doctrine and religious intent, and religious adherents and organizations will have no recourse against a wayward trial court decision that threatens to invade some of the most critical aspects of religious practice—the choice of leadership. The panel's decision was a radical departure from existing case law and Supreme Court precedent.

The panel indicated that ministerial status is a question of fact for the jury and that the ministerial exception is a mere liability defense. Both views are wrong.

*First*, ministerial status is not a factual question that requires a jury to slog through religious faith, doctrine, and structure. It is a legal question: does a religious leader perform a role protected by the First Amendment? The mere prospect of jury examination of ministerial status would severely impair the First Amendment rights of religious adherents and their institutions, and it would cause significant entanglement problems for amici's state court systems and enforcement agencies. Any employee-plaintiff can mimic what Tucker did here, excising or downplaying after-the-fact the religious words from his title and job duties to obfuscate the central question: whether a religious school's admitted "Chaplain" is a minister as a matter of law.

*Second*, the ministerial exception is not some run-of-the-mill defense to liability. It is a core First Amendment *right* to be free from the government's

regulations in matters of religious faith, doctrine, and governance. As courts broadly recognize, that right is infringed as much by judicial rooting through religious beliefs as by an ultimate imposition of liability.

In short, amici's citizens should be free to choose religious ministers without fear of government meddling, and Amici States shouldn't be required to meddle. Because the panel's split opinion muddies First Amendment waters on jurisprudential questions of exceptional importance and threatens the constitutional rights of countless religious adherents and organizations, rehearing en banc is necessary.

## ARGUMENT

**I. The panel's novel reformulation of the ministerial exception as a question of fact for the jury would lead to excessive entanglement.**

The First Amendment forbids "judicial entanglement in religious issues." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 (2020). The entanglement "doctrine protects religious institutions from governmental monitoring or second-guessing of their religious beliefs and practices." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008). One key aspect of religious autonomy protected by the First Amendment is an institution's "selection and supervision" of religious leaders. *Our Lady*, 140 S. Ct. at 2055. This protection is part of religious groups' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 2061; *accord Skrzypczak v. Roman Catholic Diocese Of Tulsa*, 611 F.3d 1238, 1242 (10th Cir. 2010).

3

When an employee brings a discrimination suit that could infringe on an institution's religious autonomy, courts must resolve whether that employee is a religious minister within the First Amendment's scope. Because of predominant questions of faith and doctrine, resolution of that question must be "sensitive" and pay due deference to "[a] religious institution's explanation of the role of such employees in the life of the religion." *Our Lady*, 140 S. Ct. at 2066, 2069. "[C]ourts must take care to avoid resolving underlying controversies over religious doctrine" and "practice." *Id.* at 2063 n.10 (cleaned up). The Supreme Court has *repeatedly* warned against "[d]eciding such questions" in a way that "would risk judicial entanglement in religious issues." *Id.* at 2069.

Thus, in both *Hosanna-Tabor* and *Our Lady*, the Supreme Court did *not* remand for a jury despite the dispute in both cases about this ultimate question of ministerial status. In *Hosanna-Tabor*, the Court held that the Sixth Circuit should have affirmed the district court's summary judgment grant, even though the district court *itself* had "highlight[ed] the existence of a factual dispute between the parties." *EEOC v. Hosanna-Tabor Evangelical Lutheran Church*, No. 07-14124, 2008 WL 5111861, at *1 (E.D. Mich. Dec. 3, 2008). Likewise, in *Our Lady* the Supreme Court held that the Ninth Circuit should have affirmed the district court's grant of summary judgment, even though the district court had found that at least one factor in the analysis weighed *against* "the ministerial exception applying." *Morrissey-Berru v.*

4

*Our Lady of Guadalupe Sch.*, No. 216-cv-09353-SVW-AFM, 2017 WL 6527336, at *2 (C.D. Cal. Sept. 27, 2017).

The Supreme Court did not remand for jury resolution for the simple reason that ministerial status is a legal question. *See* Dissent 21-22. This is no different from whether an institution qualifies as religious for First Amendment purposes or other church autonomy questions—each of which is "a question of law to be resolved at the earliest possible stage of litigation." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002) (cleaned up). Thus, courts universally resolve the ultimate question of ministerial status themselves. *See Skrzypczak*, 611 F.3d at 1244 ("the ministerial exception's application" is a "legal conclusion"); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015) ("whether the exception attaches at all is a pure question of law"); *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999) (same).

Moreover, courts have always resolved ministerial status at summary judgment, if not earlier. *E.g.*, *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568 (7th Cir. 2019); *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018); *EEOC v. Harris Funeral Homes*, 884 F.3d 560 (6th Cir. 2018); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017); *Puri v. Khalsa*, 321 F. Supp. 3d 1233 (D. Or. 2018); *Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803 (D.S.C. 2018); *Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168 (N.D. Ind. 2014) (all resolving on summary

5

judgment); *see also Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc); *Conlon*, 777 F.3d at 832; *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012); *Simon v. Saint Dominic Acad.*, No. 19-cv-21271, 2021 WL 6137512 (D.N.J. Dec. 29, 2021); *McRaney v. N. Am. Mission Bd.*, 304 F. Supp. 3d 514 (N.D. Miss. 2018); *Gregorio v. Hoover*, 238 F. Supp. 3d 37 (D.D.C. 2017); *Davis v. Balt. Hebrew Congregation*, 985 F. Supp. 2d 701 (D. Md. 2013) (all resolving on motion to dismiss).

The panel majority here blazed its own trail, however, holding that whether Tucker was a minister "is quintessentially a factual determination for the jury." Op. 24 n.8. According to the majority, a jury will "often" "have to resolve the factual disputes and decide whether an employee qualifies as a 'minister,'" Op. 17 n.4, even though such a jury resolution cannot be found referenced in any court decision of which amici are aware. And the panel found no constitutional problem with its novel rule: "If a jury's resolution of those facts indicates that the employee is not a minister, then the Establishment Clause is not implicated." Op. 48.

The panel is wrong. Requiring "a jury" to make such "judgment[s] about church doctrine" itself "would pose grave problems" under the First Amendment. *Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring). The ministerial exception would no longer be resolved quickly and sensitively to avoid interference with church autonomy. No religious institution could quickly escape legal claims from

6

disgruntled former leaders. Just look at this case, which involves virtually no dispute about the facts, but rather concerns an employee-plaintiff's effort to downplay facts showing his religious role while only truly disputing ministerial status. *See* Dissent 31 ("Under Mr. Tucker's version and other undisputed facts, he qualified as a minister in his role as Director of Student Life/Chaplain.").

Under this standard, nearly every ministerial exception case would have to await jury resolution, dragging a religious institution and its members through years of discovery and litigation before its "right to shape its own faith and mission through its appointments" is affirmed. *Hosanna-Tabor*, 565 U.S. at 188. "The harm of such a governmental intrusion into religious affairs would be irreparable." *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013). Plus, state enforcement agencies and courts would suffer the entanglement of all that a jury trial brings, from discovery to jury selection to "civil factfinder[s] sitting in ultimate judgment of what" role a leader "really" plays in the religious institution. *Id.* at 206 (Alito, J., concurring). This is all constitutionally problematic, to say the least.

II. **The panel departed from all other courts by failing to recognize that the Religion Clauses provide structural protection against interference in religious leadership disputes.**

After wrongly concluding that ministerial status is a quintessential jury question, the panel majority compounded its error by assuming that incorrect rejection of ministerial status early in litigation has no consequences. The panel dismissed this

Court's own prior analogy between religious autonomy and qualified immunity defenses on the ground that whether a religious employer is wrongly subjected to discovery and trial involves no "public interest." Op. 6. In the panel's view, wrongly entangling a church in an extended judicial inquiry does not involve even a private interest: "requiring a religious employer to incur litigation costs to defend against claims" by a religious leader "does not punish a religious employer" and is not "even entanglement at all." Op. 28 n.11, 45. This is plainly incorrect.

This Court's own precedents and many others refute these views. The public has overwhelming interests in protecting free exercise of religion and avoiding church-state entanglement of this sort. Amici's courts and enforcement bodies likewise seek to avoid unnecessary and intrusive judicial probing of religion. And religious institutions and their adherents have an interest in choosing and supervising their leaders without the inherently coercive threat of protracted litigation. In lay terms, religious groups should be able to make leadership decisions without looking over their shoulder at every turn. *See* Dissent 7 ("For example, a religious body might hesitate to fire a minister even in the face of doctrinal disagreement.").

As the Supreme Court has explained, the "very process of inquiry" into internal religious matters can "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979). Recognizing as much, this Court in *Bryce* held that the Religion Clauses "prohibit[] civil court review of

8

internal church disputes." 289 F.3d at 655. The Court said that like "a government official's defense of qualified immunity," religious autonomy defenses should be "resolv[ed]" "early in litigation." *Id.* at 654 n.1. This Court agreed that the rule applies "when considering the ministerial exception": "The types of investigations a court would be required to conduct in deciding Title VII claims brought by a minister could only produce by their coercive effect the very opposite of that separation of church and State contemplated by the First Amendment." *Skrzypczak*, 611 F.3d at 1242, 1245 (cleaned up).

Courts broadly agree that the ministerial exception, like other religious autonomy defenses, is a "structural limitation" that "categorically prohibits" the judiciary "from becoming involved in religious leadership disputes." *Conlon*, 777 F.3d at 836. These courts also recognize "the prejudicial effects of incremental litigation" on rights protected by the Religion Clauses. *Demkovich*, 3 F.4th at 982. After all, "[a] Title VII action is potentially a lengthy proceeding, involving state agencies and commissions, the EEOC," and courts. *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). During the action, "[c]hurch personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." *Id.* And intrusions like these pressure churches to make decisions "with an eye to avoiding litigation or bureaucratic entanglement

9

rather than" basing decisions on doctrinal assessments. *Id.*; *see also* Dissent 7; *Skryzpczak*, 611 F.3d at 1245 (noting discovery's "coercive effect" on religious ministries); *Petruska v. Gannon Univ.*, 462 F.3d 294, 305 (3d Cir. 2006) (even "limited inquiry" into religious matters is constitutionally problematic). Finally, the U.S. Supreme Court itself has emphasized the "ministerial exception bars … a suit" by a minister "challenging her church's decision to fire her." *Hosanna-Tabor*, 565 U.S. at 196. "The Supreme Court's language was unmistakable: It characterized the ministerial exception as a defense that would prevent the proceeding itself." Dissent 14-15. Like Judge Bacharach, amici agree that this Court should "take the Supreme Court's choice of words at face value." *Id.*

Of course, "[t]he ministerial exception's status as an affirmative defense makes some threshold inquiry necessary." *Demkovich*, 3 F.4th at 983. (The panel's emphasis on this point is difficult to understand: the same is true of qualified immunity. *See* Dissent 16.) But "discovery to determine who is a minister differs materially from discovery to determine how that minister was treated, especially because admissible evidence is only a subset of discoverable information." *Id.*

Against these precedents, the panel majority selectively quoted one law review article, Op. 28, 31, omitting that even that article *agrees* that "the ministerial exception closely resembles qualified immunity for purposes of the collateral-order doctrine" and should likewise be immediately appealable. Peter Smith & Robert

Tuttle, *Civil Procedure and the Ministerial Exception*, 86 FORDHAM L. REV. 1847, 1881 (2018). Though the panel majority also suggested that "[i]mmunity from suit is a benefit typically only reserved for governmental officials," it quickly backtracked and agreed that "collateral orders can arise in the course of private civil litigation." Op. 33–34. Indeed, this Court recently approved a new category of collateral order appeals by private parties raising a state statutory defense. *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659 (10th Cir. 2018). The panel's only response—that this First Amendment case does not involve that specific "New Mexico law" (Op. 34 n.15)—speaks for itself.

In sum, a "protracted legal process pitting church and state as adversaries" entangles the government and religion in ways that are constitutionally forbidden. *Demkovich*, 3 F.4th at 982. Avoiding this entanglement and protecting free exercise are constitutional interests of the highest order, and an immediate appeal must be available to vindicate them.

## CONCLUSION

The Court should grant rehearing en banc and reverse the panel decision.

Respectfully submitted,

*s/ Zach West*

| | |
|---|---|
| JOHN M. O'CONNOR | ZACH WEST |
| *Oklahoma Attorney General* | Acting Solicitor General |
| | *Counsel of Record* |
| | OFFICE OF THE OKLAHOMA |
| | ATTORNEY GENERAL |
| | 303 N.E. 21st Street |
| | Oklahoma City, OK 73105 |
| | Phone: (405) 521-3921 |
| | Zach.West@oag.ok.gov |

June 28, 2022

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 2,600 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: June 28, 2022

*/s Zach West*
Zach West

# CERTIFICATE OF SERVICE

I, Zach West, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated: June 28, 2022

*s/ Zach West*
Zach West
