No. 20-1230

---

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

FAITH BIBLE CHAPEL INTERNATIONAL,
a Colorado non-profit corporation,

Appellant,

v.

GREGORY TUCKER,

Appellee.

---

On Appeal from the United States District Court
for the District of Colorado
Docket No. 1:19-cv-01652-RBJ-STV
The Honorable R. Brooke Jackson

---

**BRIEF OF *AMICI CURIAE* CONSTITUTIONAL LAW SCHOLARS
IN SUPPORT OF APPELLANT'S PETITION FOR RHEARING *EN BANC***

Conor B. Dugan
Matthew T. Nelson
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
mnelson@wnj.com
conor.dugan@wnj.com
Attorneys for *Amici Curiae*

Dated:  June 28, 2022

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* ........................................................... 1

SUMMARY OF THE ARGUMENT ...................................................... 2

ARGUMENT ................................................................................... 3

    This Court has appellate jurisdiction under the collateral-order
    doctrine to review the denial of the church-autonomy doctrine's
    application and its associated ministerial exception ........................ 3

        A.    The purposes underlying the church-autonomy doctrine
              demonstrate why trial court orders denying the
              application of the ministerial exception are immediately
              appealable .............................................................................. 4

        B.    Orders denying the application of the church-autonomy
              doctrine should be immediately appealable under the
              collateral-order doctrine ......................................................... 9

CONCLUSION AND REQUESTED RELIEF .................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abney v. United States*,
   431 U.S. 651 (1977)................................................................10

*Bryce v. Episcopal Church in the Diocese of Colo.*,
   289 F.3d 648 (10th Cir. 2002) ...............................................5

*Conlon v. InterVarsity Christian Fellowship*,
   777 F.3d 829 (6th Cir. 2015) .................................................8

*Grussgott v. Milwaukee Jewish Day School, Inc.*,
   882 F.3d 655 (7th Cir. 2018) .................................................9

*Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC*,
   565 U.S. 171 (2012)........................................................2, 5, 6, 7

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in
   North America*,
   344 U.S. 94 (1952)...................................................................6

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
   903 F.3d 113 (3d Cir. 2018) ...............................................8, 9

*McCarthy v. Fuller*,
   714 F.3d 971 (10th Cir. 2013) .............................................11

*Miller v. Basic Research*,
   LLC, 750 F.3d 1173 (10th Cir. 2014)...................................10

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985)...............................................................10

*Our Lady of Guadalupe School v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020)....................................................*passim*

*Permanent Mission of India to the United Nations v. City of New York*,
   551 U.S. 193 (2007)...............................................................11

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*,     <u>Page(s)</u>
 506 U.S. 139 (1993)..............................................................................10

*Serbian Eastern Orthodox Diocese for United States of America &*
 *Canada v. Milivojevich*,
 426 U.S. 696 (1976)...........................................................................6, 7

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
 611 F.3d 1238 (10th Cir. 2010) ...........................................................4

*Tomic v. Catholic Diocese of Peoria*,
 442 F.3d 1036 (7th Cir. 2006) .............................................................8

*Watson v. Jones*,
 80 U.S. 679 (1871)...........................................................................5, 6

## Other Authorities

Carl H. Esbeck, *After* Espinoza, *What's Left of the Establishment Clause?*
 21 Federalist Soc'y Rev. 186 (2020) ...................................................7

Douglas Laycock, *Church Autonomy Revisited*,
 7 Geo. J.L. & Pub. Pol'y 253 (2009) ..................................................5

### INTEREST OF *AMICI CURIAE*[1]

*Amici* are scholars whose work focuses on the First Amendment.  For decades, they have closely studied constitutional law and religious liberty, published numerous books and scholarly articles on the topic, and addressed it in litigation.  They write to aid the Court in understanding the importance of the issues presented in this case.

Elizabeth A. Clark is Associate Director of the International Center for Law and Religion Studies at the J. Ruben Clark Law School at Brigham Young University. Robert Cochran is Professor of Law at Pepperdine University. Richard W. Garnett is the Paul J. Schierl/Fort Howard Corporation Professor at Notre Dame Law School. Michael P. Moreland is University Professor of Law and Religion at Villanova University's Charles Widger School of Law. Robert J. Pushaw is the James Wilson Endowed Professor of Law at Pepperdine University School of Law. Eugene Volokh is the Gary T. Schwartz Distinguished Professor of Law at the UCLA School of Law.

---

[1] Pursuant to this Court's Rule 29(a)(2) and (4)(E), *amici curiae* state that this brief was not authored in whole or in part by counsel for any party, and that no person or entity other than *amici curiae* and their counsel made a monetary contribution to the preparation or submission of this brief. All parties have been timely notified of the filing of this brief.

## SUMMARY OF THE ARGUMENT

The United States Supreme Court's decisions in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) and *Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012) recognize that the Free Exercise and Establishment Clauses of the First Amendment guarantee churches' and religious organizations' rights to autonomy from government interference with their internal affairs. The church-autonomy doctrine's purpose is not only to protect personal and organizational religious liberty, but also to protect the Establishment Clause's *structural* limitations on government action. The church-autonomy doctrine functions to categorically forbid the state from revisiting certain religious decisions made by religious organizations. The ministerial exception is a specific application of the church-autonomy doctrine to the selection, supervision, and removal of those holding certain important religious positions within religious organizations.

The Panel's decision discounts the structural protections to the judicial system provided by the church-autonomy doctrine and the related ministerial exception. Both doctrines serve to prevent the judicial branch from entangling itself in religious disputes. The ruling here that decisions rejecting the application of these doctrines cannot be appealed under the collateral-order doctrine means that courts will not only lose the structural protection provided by these doctrines,

but also inflict the very harms the First Amendment prohibits. As such, the Panel's

decision is anomalous. The federal courts allow collateral-order doctrine appeals

for the denial of the protection afforded by every other constitutional doctrine that

provides immunity from suit.

Because of the fundamental rights at issue and the momentous consequences

of the Panel's error, this Court should grant rehearing *en banc*.


## ARGUMENT

**This Court has appellate jurisdiction under the collateral-order doctrine to review the denial of the church-autonomy doctrine's application and its associated ministerial exception.**

The Panel's decision contains various errors regarding the church-autonomy

doctrine and the related ministerial exception. For example, the Panel states that

the ministerial exception "only precludes employment discrimination claims

brought by a 'minister' against his religious employer." (Slip Op. 11.) But the

Supreme Court has explained that the ministerial exception prohibits judicial

intervention more broadly in "employment disputes involving those holding certain

important positions with churches and other religious institutions. *Our Lady*, 140

S. Ct. at 2060. Among the most important errors is the Panel's failure to apply the

collateral-order doctrine to allow the immediate appeal of trial court rulings denying the application of the ministerial exception.[2]

### A. The purposes underlying the church-autonomy doctrine demonstrate why trial court orders denying the application of the ministerial exception are immediately appealable.

Within our constitutional government, the government cannot interfere with the internal affairs of religious organizations, including matters of faith, doctrine, and internal governance. Like the First Amendment Religion Clauses that vivify it, the church-autonomy doctrine and its ministerial exception protect the courts. By

---

[2] The Panel's efforts to draw a distinction between the ministerial exception and the church-autonomy doctrine are misguided. (*See* Slip Op. 11-16.) The ministerial exception is a particular application of the broader doctrine. *See Our Lady*, 140 S. Ct. at 2060 (stating that the "'ministerial exception' is based on the "insight" that the First Amendment protects churches' "autonomy with respect to their internal management"). Decisions regarding the selection and supervision of teachers at religious schools are off limits to judicial review because the "religious education and formation of students is the very reason for the existence of most private religious schools, and . . . judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate." *Id.* at 2055 (cleaned up). This Court has acknowledged the ministerial exception as an application of the church-autonomy doctrine, holding, for instance, that it "prevents adjudication of Title VII employment discrimination cases" brought by "any employee who serves in a position that 'is important to the spiritual and pastoral mission of the church.'" *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1242, 1243 (10th Cir. 2010) (citations omitted). The Panel, while acknowledging that the ministerial exception is a "narrower offshoot" of the church autonomy doctrine, minimized that exception.  (Slip Op. 11.)

injecting themselves into religious questions, courts undermine their credibility and authority.

This Court has explained that the church-autonomy doctrine "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002) (citation omitted). The doctrine stems from the First Amendment's Religion Clauses, and it affirms the constitutional right of churches to "decide for themselves" matters of church government, faith, and doctrine free from state interference. *Id.* A claim of church autonomy "is a claim to autonomous management of a religious organization's internal affairs." Douglas Laycock, *Church Autonomy Revisited*, 7 Geo. J.L. & Pub. Pol'y 253, 254 (2009).

The church-autonomy doctrine and its ministerial exception are rooted in the structural concern that courts do not become entangled in resolving religious disputes as to which they have no constitutional power. So in *Hosanna-Tabor*, the Supreme Court rooted its analysis in three cases dating back nearly 150 years, all involving property disputes, and all of which recognized that the government is categorically prohibited from contradicting ecclesiastical decisions. *Hosanna-Tabor*, 565 U.S. at 185–87.

First, in *Watson v. Jones*, 80 U.S. 679 (1871), the Supreme Court declined to interfere with a denomination's determination as to which faction of a church

rightly controlled the church's property. Rather, it adopted the common-law rule that courts could not review or overturn decisions by religious bodies on "questions of discipline, or of faith, or ecclesiastical rule, custom, or law. . ." *Id.* at 727.

Some 80 years later, the Supreme Court declared that *Watson* "radiate[d] . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, *free from state interference*, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (emphasis added). In *Kedroff*, the Court applied the First Amendment to an ecclesiastical question for the first time. *See Hosanna-Tabor*, 565 U.S. at 186. There, the Court struck down a New York law that purported to decide which Russian Orthodox faction was entitled to control a cathedral because the issue was "strictly a matter of ecclesiastical government." *Kedroff*, 344 U.S. at 115–19. Such issues are "forbidden" to the "power of the state." *Id.* at 119.

In *Serbian Eastern Orthodox Diocese for United States of America & Canada v. Milivojevich*, 426 U.S. 696, 721 (1976), the Court determined that courts cannot "delve into the various church constitutional provisions" because to do so would repeat the lower court's error of involving itself in "internal church government, an issue at the core of ecclesiastical affairs." It explained that the First

6

Amendment allows "religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Id.* at 724. Courts must accept the decisions of religious tribunals on these matters. *Id.* at 725.

These cases animated the Supreme Court's recognition of the ministerial exception in *Hosanna-Tabor*, where the Court emphasized that the judiciary is categorically forbidden from resolving religious disputes. And in *Our Lady*, the Supreme Court further clarified that the underlying concern includes the structural need to separate religious issues from government intrusion. "The Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Our Lady*, 140 S. Ct. at 2060 (cleaned up).

Lower courts "have properly interpreted the ministerial exception not as a personal right, but as a structural limitation on government action." Carl H. Esbeck, *After* Espinoza, *What's Left of the Establishment Clause?* 21 Federalist Soc'y Rev. 186, 200 (2020). The limitation articulated "is a constraint on the power of the government . . . rooted in large part in the Establishment Clause." *Id.* And that "makes sense because what is being protected . . . is autonomy in internal operations and governance, not a right of religious staffing." *Id.* at 201. While the church-autonomy doctrine does not "mean that religious institutions enjoy a

general immunity from secular laws, it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady*, 140 S. Ct. at 2060 (cleaned up).

Various other lower courts had already reached the same conclusion. The "constitutional protection" implicated by the church-autonomy doctrine "is not only a personal one; it is a structural one that *categorically* prohibits federal and state governments from becoming involved in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) (emphasis added); *see also Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n. 4 (3d Cir. 2018) (concluding that church had not waived the ministerial exception because it "is rooted in constitutional limits on judicial authority."); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (courts "have an interest independent of party preference for not being asked to decide" religious issues), *abrogated on other grounds*, *Hosanna-Tabor*, 565 U.S. 171.[3]

---

[3] The Panel's attempts to distinguish these cases misses the point for which they are cited. (Slip Op. 40.) That the ministerial exception does not provide categorical immunity to religious employers from all employment discrimination suits does not mean that the exception does *not* provide a structural protection for religious organizations *and* courts. And it is that structural protection that requires early resolution of the question—and interlocutory appeal.

The structural interest in avoiding the establishment of religion means the church-autonomy doctrine and the ministerial exception are unlike most other affirmative defenses. Courts have no intrinsic interest in whether a party's claims are barred by contributory negligence or duress. But because of the structural limitation imposed by the church-autonomy doctrine on the exercise of judicial authority, courts do have an interest in ensuring that the exception is applied even where the parties fail to raise the doctrine or where someone claims that they have waived it affirmatively. *See*, *e.g.*, *Lee*, 903 F.3d at 118 (upholding application of the ministerial exception where trial court raised the issue *sua sponte*); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 658 (7th Cir. 2018) (stating that "a religious institution does not waive the ministerial exception by representing itself to be an equal-opportunity employer"), *cert. denied*, 139 S. Ct. 456 (2018).  Thus, courts are required to determine whether the church-autonomy doctrine bars a case or part of a case *before* considering the merits of the plaintiff's claims.

**B.    Orders denying the application of the church-autonomy doctrine should be immediately appealable under the collateral-order doctrine.**

Because of the nature of the church-autonomy doctrine and its related ministerial exception, interlocutory trial court decisions denying the application of the church-autonomy doctrine or ministerial exception generally must be

immediately appealable. Indeed, continuing the litigation process itself causes the very harms that the First Amendment prohibits.

This is precisely the sort of situation to which the collateral-order doctrine applies.  As this Court has explained, appellate jurisdiction "under the collateral order doctrine" arises where "district court's order . . . [1] conclusively determine[s] the disputed question [on appeal], [2] resolve[s] an important issue completely separate from the merits of the action, and [3] [is] effectively unreviewable on appeal from a final judgment." *Miller v. Basic Research*, LLC, 750 F.3d 1173, 1176 (10th Cir. 2014) (cleaned up).  With respect to the last of these factors, the "decisive consideration" is "whether delaying review until the entry of final judgment would imperil a substantial public interest or some particular value of a high order." *Id.* (quotation omitted).  It is hard to imagine many interests more important or higher-order values than the vindication of the First Amendment.  The Panel's decision hardly engaged these higher values.

The Panel's decision creates a legal anomaly. Other doctrines relevant to constitutional adjudication which act to give immunity from suit—sovereign immunity, qualified immunity, and the prohibition on double jeopardy—are all subject to collateral-order review. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) (11th Amendment); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (qualified immunity); *Abney v. United States*, 431 U.S.

651, 659 (1977) (double jeopardy). *See also Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007) (foreign sovereign immunity).

Under each of these doctrines, courts recognize that immediate appeal is necessary in order to prevent the harm of being haled into court before it is irreparable.  The same harm is meted out on the parties when the church-autonomy doctrine and ministerial exception are wrongly not applied. Not only does the defendant lose constitutional rights—like in the context of double-jeopardy and sovereign immunity—but because the church-autonomy doctrine and the related ministerial exception also protects against the government's intrusion into quintessential religious questions—such as who a religious organization's ministers are—the structural harm to the judiciary occurs *because* of the judicial proceedings. Thus, an order declining to apply the church-autonomy doctrine should be immediately appealable under the collateral-order doctrine like decisions denying qualified immunity. *See McCarthy v. Fuller*, 714 F.3d 971, 975 (10th Cir. 2013) (citing *Mitchell*, 472 U.S. at 527).

Here, the district court's denial of summary judgment and insistence on proceeding with discovery during the appeal violate the key purposes of the church-autonomy doctrine.  And the Panel's decision compounds the harm by concluding that this Court, unlike its sister circuits, did not now have jurisdiction.

11

In short, the Panel's decision subjects Faith Bible to judicial review of an internal church dispute—precisely what the church-autonomy doctrine is intended to prevent.  It will also impermissibly entangle the district court in religious matters.  Rehearing *en banc* is warranted because of the substantial public interests at stake.

## CONCLUSION AND REQUESTED RELIEF

For all the above reasons, the *Amici* urge this Court to grant rehearing *en banc*.

Dated:  June 28, 2022

*s/  Conor B. Dugan*
Matthew T. Nelson
Conor B. Dugan
Warner Norcross + Judd LLP
1500 Warner Building
150 Ottawa Avenue NW
Grand Rapids, MI 49503
(616) 752-2000
mnelson@wnj.com
conor.dugan@wnj.com
Attorneys for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 2,573 words, excluding the parts of the brief exempted under Rule 32(f) and 10th Cir. R. 32(B), according to the count of Microsoft Word.

Lastly, I certify that pursuant to this Court's guidelines on the use of the CM/ECF System:

a) All required privacy redactions have been made per 10th Cir. R. 25.5 and Fed. R. App. P. 25(a)(5);

b) The hard copies that will be or have been submitted to the Clerk's Office are *exact* copies of the ECF filing; and

c) The ECF submission was scanned for viruses with the most recent version of a commercial virus-scanning program and, according to the program, is free of viruses.

Dated:  June 28, 2022            *s/ Conor B. Dugan*
                                 Conor B. Dugan

# CERTIFICATE OF SERVICE

I certify that on June 28, 2022, I caused the foregoing to be served

electronically via the Court's electronic filing system on all parties to this appeal.

*s/ Conor B. Dugan*
Conor B. Dugan